Good morning, Your Honors. Mark Mosser on behalf of the appellant. May it please the Court, Your Honors, there's a lot of issues of notice in this case. The judge linked the propriety of his decision to the timeliness of complaints by my clients. The decision itself was wrong relative to even that. My client complained in November of 2007. The investigation wasn't started until August 28th, 22nd of 2008. Be that as it may, the record shows a number of other women complained of pretty much the same conduct years prior to my client complaining. Well, counsel, in order to establish hostile work environment, you have to sustain the burden of establishing that there was severe and pervasive working environment. And, of course, we apply an objective test. Why did the – why did the – where did the court go wrong, put it that way, given that background? There's a lot of conduct here, Judge, and the primary essence of this case was the physical threatening demeanor of this 260-pound man who stood over women on a regular basis, said, aren't you scared of me, deliberately intimidated them, put his face two inches away from theirs, shouted at them, referred to women as fucking bitches and bitches, slammed the phones down, paced up and forth in a violent manner, slammed the doors. He was very, very threatening. One of the ploys adopted by the district attorney's office is to say, well, there's all this other conduct. A lot of the other conduct is outside the office. That's not the point. This court takes into account the totality of the circumstances. My client knew of the domestic problems with Spring-Miller. My client knew. She saw it. Spring-Miller worked in the DA's office, and she saw the abject fear, and she was told by Ms. Miller, I'm more worried about you, Amy Peterson, than I am about myself. Excuse me, counsel. When you said the first notice, are you referring to the November 5th, 2007 memo? Is that what you're referring to with respect to the first complaint that was made by your client? Yes, Your Honor. That's on November 1st, 2007, Ms. Spring-Miller sought a TPO. On November 2nd, Ms. Miller provided a written statement. And then on November 5th, my client presided over a written statement, as did Ms. Miller. Her fears were denigrated, consistently denigrated and trivialized. And, Your Honor, they transferred my client based on the problem that they attempted to deny. And they would like to have this court, they repeatedly try to have the notice run from August 1st, 2008. That's absurd. August 1st, 2008 was the date when they actually got the formal EEOC or the NERC charge of discrimination. Although, excuse me for interrupting. The county suggests that with respect to the first contact, the November 5th, 2007 contact, they describe more of this as a personality conflict. Precisely. And suggest that in the November 5th, 2007 memo, your client does indicate that she was apologized to and that she took that apology sincerely and that she does mention that, in essence, the defendant rubbed her the wrong way or the employee rubbed her the wrong way. And there's also, there's much discussion in there about the issues with Ms. Miller and what she had learned about with respect to Ms. Miller and the concern for some type of violence. What is your response to that argument to say, well, this November 5th, 2007 document really puts the county on notice of sexual harassment?  The parlance, fucking bitch, said in an angry manner by a large male is certainly a personality conflict. It's also sexual harassment. Although, was that statement made to your client? Was that a statement that was made to Ms. Miller? That was made to Ms. Miller? Well, I'm not sure who that statement was made. My client often heard Mr. Manline slam the phone down. Her testimony was she heard this almost on a daily basis. She would observe when she worked for about approximately five months, she worked right closely with him, with her desk. She would see him getting conversations and refer to women as fucking bitches. And it's in that context that all of this other conduct occurred. And the conduct was trivialized, Your Honors. It was, you watch it being trivialized. Mr. Manline, he tried to back off of it, but he admitted he was told by Mr. Gammack and Ms. Wyatt that there was a witch hunt against him. He was told to keep his eyes open. He was basically coddled by the DA for years. All of these other complaints, Susan Ayazi, who is the maternal grandmother of Mr. Gammack's grandchildren, was the first victim of Mr. Manline. And he, for whatever reason, Mr. Gammack routinely ignored a series of complaints. Now, granted, a lot of these women didn't use the magic verbiage. Your Honors, could I reserve two minutes, please? You may do so. Just watch the clock. They didn't use the magic verbiage, sexual harassment. But when, as an HR manager, you receive one complaint after another, that this large guy, 260-pound guy, is standing over women and yelling at them. Now, this conduct is directed only at women. It's only directed at women. The armed investigators don't have to put up with this nonsense. And the testimony, the uncontroverted testimony in this case is that on a number of occasions, the hands of the armed investigators would stray down to their guns. The armed investigators were involved in warning Ms. Miller. There was an escort. One of the things the district attorney complained about here, because it resulted from their own refusal to deal with the situation, is some of the employees took it upon themselves to protect Ms. Miller as she was walking to and from her car. Now, that's a normal, laudable reaction of men towards women who are threatened. And yet, Mr. Gammack put the kibosh on that. You look at the workplace violence nonsense. It's incredible. The evidence of pretext here in the layoffs and in the primary layoffs and also in the transfer, you can see that in the extraordinary history of workplace violence in this work environment, where we have felony knife assaults. Now, I like Mr. Rusk. Mr. Rusk is the kind of guy I would go down a river with and probably have a good time. But his conduct in the workplace was completely unacceptable. At one point, he pointed a gun at an employee and put the laser dot on his foot. On two occasions, he held a knife to Mr. A razor-sharp, very nasty knife, fighting knife, to Mr. Covering his throat. He was on the bomb squad. He would make threats to blow people up. He was never disciplined or investigated for this nonsense. And it went on for years and years and years. Little Angie Earl, the co-plaintiff on this case who dropped off for personal reasons, she waits three days to report, I'm going to chop the bitch up and bury her by the side of the road. And she is disciplined for failure to report workplace violence. That is a nonsensical position, Your Honors, because what happens if you allow the adoption of that kind of conduct, then the harasser then, once he's not reported immediately, then acquires a license to continue with harassing conduct, because when somebody finally reports him, the victim will then be disciplined. Counsel, what's the evidence of the pretext with respect to the termination? There's a lot of evidence, Judge. First of all, you have a pool of about 210 people. And out of those 210 people, the five investigators, exclusive of Mr. Manline, are laid off. Mr. Manline was fired. He was fired for stalking a prostitute who he came across on his process serving. There was five investigators and one lawyer. And in July 2008, that lawyer went on a river trip with me. And so those are the people who were laid off. And there was no cost-benefit analysis done. Mr. Gamak, when asked at deposition whether he knew whether the personnel working for the private contractor had access to these essential programs, CJIS and NCIC in Tiburon, did not even know whether they had access to that. The testimony is that the investigators, the armed investigators, are now reduced to going out and attempting to find people. So their duties have changed. And that's a hidden cost that's built into the transfer of these functions outsourced. There's been no study done on that whatsoever. And then we have the opposition of Terry Rusk. And Terry Rusk, as aberrant as some of his conduct is, is a very skilled and very knowledgeable police officer and was there for 30 years and was actually in some ways very well liked. My clients like him. I like him. And he's a skilled guy. He was vehemently opposed to this outsourcing. He was not consulted. He was gone by the time it happened, but Mr. Gamak, since that time, has had lunch with him. He was not consulted, and he previously opposed this outsourcing. He said it wouldn't be any good. So the only people and the only way they could get to Angie Earle and Aimeen Peterson, who were number one and two in seniority, was layoff. The other evidence of pretext. We have the extraordinary over five-month administrative leave that Angie Earle was put on. We have her being escorted from the building like a criminal. We have the extraordinary discipline against her, juxtaposed to the failure. Mr. Manline was never disciplined for sexual harassment. They want to dress up that day on the beach that he got. He was never, judges, he was never investigated for sexual harassment. Mr. Gamak put this off and put this off and put this off and refused to investigate it, and they didn't start the investigation until August 22, 2008. And then when I was finally allowed into the room with my client, I had to listen to a professional defense lawyer from Little Mendelsohn wear her finger and yell at me and tell me how they were going to affect ex parte contact with my client. And that itself is an act of hostility. And then you have this consciousness of guilt where they, when I was on this river trip and they found that I was on the river trip, they tried to get my clients to sign a document which falsely represented that they had access to the computer programs, which they had not had access to those computer programs. And the computer programs were dismantled at their workstations. And they could go down and they could talk to investigators, but they couldn't do the job as thoroughly because they were imposing on people. Sometimes the investigators were there and sometimes they were not. So the long and the short of it here is what you have is the interim solution for five months to the problem posed by this large misogynistic male was an adverse transfer of two women whose jobs were made more difficult by deprivation of computer programs which were essential because when you go out and serve somebody, the court has seen plenty of fact patterns, when you serve somebody you want to know who that person is and how dangerous they are and whether they have a history of violence and whether you should bring a couple of the armed investigators with you. They were denied, not completely, but their access to those programs, a more apt way of saying it is their access to those programs was rendered more difficult. And Interlochopher v. Turnage at 973 Pet Second, I think it's page 780, note 9, I think it is, that is precisely the kind of conduct that is prohibited by that. And all of this conduct links together, Your Honor. So to answer your question, I think there is a synergistic effect which links all of this conduct together and shows pretext as to, and you have Mr. Gamak's trivialization of these complaints. He referred to all of these women complaining as a feeding frenzy which gives the lie to the proposition that he didn't know about it. He knew very well about it and he trivialized it by calling it a feeding frenzy and then he laid, as a last resort, he laid off the complaints. You're down to about two minutes, counsel, if you want to reserve. I do. Yes, you may. We'll hear from the county. May it please the Court. My name is Steve Balkin. I represent Washoe County in this case.  And perhaps the most probative document in this entire case is what Mr. Mouser just admitted to, the first complaint made by Amy Peterson in this matter. That's dated November 5, 2007. It's an excerpt of the record at 599 and 600. That is the document, the only document, that Amy Peterson ever provided to the county concerning the conduct of Mr. Manline. And in that document, what she does is complain solely about the way Mr. Manline dealt with the public. I mean, this is a public job. You serve process to people and you do that on a daily basis. Ms. Peterson had her way of doing it and Mr. Manline had his way of doing it. But that's it. And I would ask the Court just to look at that document and find in there where there's a complaint of sexual harassment by Ms. Peterson in this document anywhere. And not only does she say it's her frustration with the way he deals with the public, she gives four specific and discreet examples of businesses that he's been to and for which he believes these people complained about his conduct. But it's just his nature, how he did his work, and that's what it's about. That's what this dispute is about. And, Your Honor, I would submit that there is nothing in any way, shape or form in that document that puts the county on any type of notice of any sexual harassment or a complaint by Ms. Peterson concerning Mr. Manline in any way in that document. What happened in this case, which is a bit unusual, is Mr. Mouser's other client, Ms. Earle, what she did is she didn't like Mr. Manline, so what she did is she ginned up as much information and stuff as she could to get Mr. Manline in trouble. And so what she did is she talked to Spring Miller, who was a lady who had lived with Mr. Manline for three years and their relationship broke up. Problems surfaced after that. So Ms. Earle went to Spring Miller, tried to find out everything she could about that relationship, why it broke up, etc., etc., and lo and behold, she goes throughout the office and tells people all about this. And, of course, there's a problem. And then the problem comes to the attention of the county. The county then investigates it and addresses it. But every complaint of Ms. Miller, and you heard counsel talk about some issues of chopping somebody up and throwing them in the ditch, that was some comment that was made between Mr. Manline and Ms. Miller during their personal relationship when they lived with each other for three years. Everything Ms. Miller complained about, every last thing she complained about in this matter, was about their personal relationship. They went to a Giants game. He dropped a hot dog. He blamed it on her. I mean, whatever. It all happened on their time. And Title VII has nothing to do, Mr. Mousert talks about the totality of the circumstances, Title VII has nothing to do with people's private lives as they live at home and go to ball games and cavort around the community. It has nothing to do with that. Counsel, you heard Mr. Mousert's chronicle of all of the activities that went on. Certainly this man's conduct was not isolated. Why don't you respond to the atmosphere issue, which is really controlling. Well, certainly, Your Honor. And, again, what I would refer the Court to is this document by Ms. Peterson. Not one mention is made in there of any of that. And I specifically ask Ms. Peterson, well, how many times did you hear him use the word bitch in the employment setting? She could remember one use of that word bitch, one time to some other employee who he was having a problem with on the phone. One. That's all she said. I said, tell me how many people, give me their names. One person. And it was Joyce Wettenkamp. That's one instance. And then, Your Honor, one of her claims is, in this case, is this idea that Mr. Manline was involved in behavior of threatening women. I asked her, did he ever threaten you? Her response, no, he did not. I then asked her, did you ever hear him threaten any other woman? Her answer, no, I did not. Well, I said, did you ever hear any, did you hear anything from anybody about him threatening a person? And she said, the only person I heard it from was Spring Miller. And that was in connection with this whole investigation that was undertaken by the county. And that was, again, the personal relationship outside the office. So we hear a lot about this from Mr. Mouser and how all this happened and how all Ms. Peterson heard all of this stuff. She didn't hear any of it. Your Honor, I asked her specifically, and that's in the record, every bit of this information. Excuse me, counsel. Would you address the comment that Mr. Manline made to Ms. Peterson, that he didn't understand why a woman would be hired to work in a job like that? Yes. And, in fact, that statement is included in the November 5th memo, is it not? Yes. Yes, it is, Your Honor. That absolutely is the case. And the interesting thing about that is she never complained about that, ever, until this November 5th incident. That happened when she was on a ride-along. Mr. Manline was trying to determine whether he wanted to participate or accept this job if it was offered to him. So he went on a ride-along. And, of course, going on a ride-along, they're serving papers. And Mr. Manline is a guy from New York and was involved with the transportation system there and had some issues with people threatening his life and stuff. And he mentioned that, you know, this job could be a dangerous job. Is it too dangerous for women? That comment was made. He made it to her before he was hired. And then after he was hired, she never complained. And the hiring occurred in March of 2008. Never complained about that until the end. And to be quite candid with you, Your Honor, she never complained at all. She was asked to make a statement about Ms. Miller, and that's what this November 5th document is. She was requested by the county. Well, we heard that you know Mr. Manline, you work with him. Can you tell us if you had any problems with him? So she brings it up there. And what happened? After this happened, Mr. Manline was counseled about that, told to improve, you know, try to limit his contact with these ladies, try to get along with these ladies. He was then told to attend three EAPs, Employment Assistance Program, counseling sessions. And he was also given a day on the beach. He was suspended for a day. And he apologized to her. He said, I am so sorry that you took this comment that way. I apologize to you. And so that's what he did with respect to that issue, Judge. And I would say that's the only issue that even remotely gets anywhere, and it's one isolated incident with him. And he explained it. He explained what he meant by her. He apologized. And the other interesting thing about it is it's uncontroverted. She accepted his apology as being sincere. She said, I accepted it. I believe he was sincere when he was apologizing to me. I think the other so and here's the other interesting thing about this case, Your Honor. Mr. Mouser argues that, well, November of 07 happens. That's when the Spring Miller thing broke out. And he wants to, we're damned if we do it, we're damned if we don't. We went ahead and they asked to be transferred to different floors away from him. We said, okay. The union representative asked for it. We said, okay, we do it. So now we're sitting here trying to defend it because we accommodated her at her request. But the interesting thing is from November 07 until the outsourcing of this entire department occurred in 2009, July of 2009, nothing ever happened between the two because they never worked together again. They were kept separate the entire time. They worked on, she worked on the fifth, fourth floor. He worked on the fifth floor. And then when they got back to the same floor, they put Mr., they finally decided, they elected to come back. They put Mr. Manlin in a different location. They never ever. So there's no harassment. They don't even see each other. And the other interesting thing, Judge, 75 percent of these women's work and the men's work as process service is done outside the office. They don't interface with each other 75 percent of the time in the workplace. Seventy-five. And so that's what happened, Your Honor, is nothing happened from November forward. All that happened before that is this one issue. And, of course, the odd incident with Springbiller, which has nothing to do with this case. It's the interpersonal relationship between the two outside the office. Now, if I can move on to this, the final issue, is this issue of the outsourcing. As this Court can take judicial notice of the fact that there's a tremendous amount of burdens being placed on these communities, these municipalities, and financially, the taxes, revenues are down everywhere. The real property problem and the assessed valuations, all of that has happened. So what happened? And, Mr. Mousermarker, there's pretext all over the place. That is just ludicrous and nonsense. What happened is this. The county looked at, the district attorney's office looked at, what can we do? They looked at non-statutorily required functions of the office. What can we get rid of so that we can meet these mandates of the commissioners and save us money? The first thing they looked at was family support services. That's a function the state has. The county was working in that area at the time, taking that obligation on. So they got rid of it. They said, state, you take it back. It saved them $500,000. And they eliminated 20 positions, 20 positions, full-time district attorney's offices. This happened in September of 2008. Then the next budget year comes around. Actually, that was the same budget year. Then the next issue comes, the commission, you need to save more money. So what did they do? They looked at the next non-statutorily required function of the office, and that was process servers. So what the district attorney's office did is they looked at these two issues, the ones that weren't statutorily required. That's what they did. Well, we can't get rid of stuff that we have to do by law. Let's get rid of stuff that we don't have to do by law. And process servers was one of them. They outsourced it. Mr. Mouser would say there's been no study on it. They saved, Your Honor, it's in an affidavit in this case, they saved 33% on salaries alone, $50,000 on cars right off the bat where they wouldn't have to spend the money on that. They got 24-7 service instead of 8-to-5 service five days a week. It was economically a great savings to the county. And how anyone in this case could, and men and women, both lost their jobs. There were process servers that were men. There were process servers that were women. And that's what happened with respect to that. That claim, there is no claim of retaliation there, Your Honor. I would submit it would be an impossible burden in this case to meet that when both men and women met that. And we also believe there's a case, Your Honor, that says that isn't an adverse employment action, the Hopkins case, which was cited to the Court. Thank the Court for its indulgence in this issue. Counsel, I've got a question. Yes, Your Honor. The performance appraisal in February of 08, where does that fit in this big picture? Well, Your Honor, I can tell you where that performance appraisal fits into this case. Specifically in her deposition, I asked her, I asked Ms. Peterson, ma'am, were you able to perform on a quantity level, i.e., the amount of subpoenas that you served before from a pure quantity standpoint, could you meet that? Did you serve just as many subpoenas as you did before November of 2007 through November 2007, December, January, February, March? I asked her the question. Answer, yes. Also, her performance evaluation, the question is whether her quality of work, whether she was still able to perform at the quality of her work, customer satisfaction complaints. Her response was, yes, I was. So I asked her specifically that question in her deposition, and she responded that, yes, she was able to do both quantity-wise, quality-wise, no difficulty, able to perform all of her functions and were satisfactory, satisfactory performed and performed, and that's also noted in her personnel evaluation. Yes, Judge. But she's marked down as needing improvement in working relationships, and this is the focus here, is it not? Your Honor, that is one of the issues that is one of the issues. She was marked down on that, Your Honor, in that specific regard. But that, you know, it's a two-way street here. She said she has all these problems with Mr. Madline. There's no notice of what problems they are to him. But the proof's in the pudding, Judge. There was no problem after November of 2007, after this issue occurred. They just didn't interface with each other. So with respect to that issue, Your Honor, it was this whole idea of the Spring-Miller and the Angie Earle. These two ladies got together and brought up these issues. And, but, Judge, her personnel evaluation, if you look at the personnel evaluation, overall it is above average, and with respect to the way she performed her work and the quality of her work, it is considered outstanding. Thank you for your time. Thank you, counsel. Mr. Mazur, you have some reserve time. Thank you, Your Honor. Your Honor, there was a huge problem after November 2007, and my client was witness to that problem. She witnessed the campaign to get Angie Earle, which they got. And she knew she was next. The reason there was hesitancy in the November 5th complaint was because my client was aware of all the other complaints which had been ignored and trivialized. The proposition that this district attorney's office wasn't aware this was a sexual harassment complaint until August 1st, 2008, is absurd. There was extensive correspondence, and it's in the record, between myself and Mr. David Watts-Vielle, a deputy DA, whereby I was continually told, we are going to meet with your clients without you. And that's Rule 4.2 of the Nevada Rules of Professional Conduct, and it's very simple. The attorney-client relationship trumps the employer-employee relationship when it comes to that issue. Mr. Watts-Vielle was very discourteous and refused to abide by that and continually threatened my client. My client was aware of that. The testimony here, the proposition my client only witnessed this one time is simply it's contradicted by the record. She said, pretty much daily, he just seemed very agitated and angry. Overall, it was pretty much daily. He would stop around. He would slam things down. He would slam the phone. He was not only rude to the public. I recall people in federal DAC calling sometimes to apologize on his behalf for the way he had spoken to him. And she goes on to talk about how she witnessed references to women as bitches and fucking bitches on a number of occasions. This wasn't one. Mr. Bakkenbush is referring to the one incident she specifically remembered. The testimony establishes this has happened all of the time. I'd ask the court to take a real good look. I understand that the problems between Spring Miller and Mr. Manline were mostly outside the workplace. The statement, I'm going to chop the bitch up and bury her by the side of the road, was said by Mr. Manline at work, apparently in reference to Ms. Miller. And Ms. Miller came into the workplace, and it's in the context of all the other women who were terrorized by this fellow. Excuse me. Wasn't that comment made in the car to Ms. Miller, and she indicated that she wasn't afraid of that comment? There was one tiny reference. I'd ask the court to read that November 2nd letter closely. What the DA's office did is they took the one remark where he said he was joking about chopping her up, and they took that and they tried to color the entire five-and-a-quarter page letter. I'd ask the court to read that statement closely. It's incriminatory. Thank you, Your Honors. Okay. Thank you, counsel. The case just argued will be submitted for decision.
judges: Hayes, O'scannlain, Bybee